## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNIVERSITY MEDICAL CENTER OF | ) | |
| SOUTHERN NEVADA, | ) | |
| 1800 W Charleston Blvd, | ) | |
| Las Vegas, Nevada 89102 | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC D. HARGAN, | ) | |
| Acting Secretary of Health and Human Services | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, DC 20201, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

### NATURE OF SUIT

1.     This is an action by the University Medical Center of Southern Nevada ("University Medical Center" or "the hospital") for judicial review of and declaratory and injunctive relief from a policy adopted by the Department of Health and Human Services ("HHS") that severely and unlawfully reduces Medicaid reimbursement for a "disproportionate share hospital" ("DSH") that treats a large number of low-income patients.

2.     The Medicaid Act requires State Medicaid programs to establish hospital payment rates in a manner that takes into account the financial burden shouldered by a DSH in treating low-income patients.  *See* 42 U.S.C. § 1396a(a)(13)(A)(iv).  The Medicaid Act also establishes a hospital-specific cap on DSH payments based on a statutorily defined measure of certain uncompensated care costs.  *See* 42 U.S.C. § 1396r-4(g)(1)(A).  Specifically, it requires that these uncompensated costs be determined net of only certain enumerated payments for services

furnished to low-income patients. *Id.* The statutory measure does not reduce uncompensated care costs by all payments for those patients. *Id.*

3.    Contrary to the plain language of the statute dictating what counts as costs for purposes of the DSH payment limit, and the HHS's original, contemporaneous interpretation of it reflected in the regulations, the agency in 2010 began applying a substantively and procedurally invalid policy that unlawfully reduces Medicaid DSH payment limits.

4.    This Court and several others have already preliminarily or permanently enjoined the Secretary from enforcing the policy. *See Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014); *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2016 WL 1048023 (D.N.H. Mar. 11, 2016); *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2017 WL 822094 (D.N.H. Mar. 2, 2017); *Children's Hospital of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672 (E.D. Va. 2017); *Tennessee Hosp. Ass'n v. Price*, No. 16-cv-3263, 2017 WL 2703540 (M.D. Tenn. June 21, 2017); *Children's Health Care v. Price*, No. 16-cv-4064 (D. Minn. June 26, 2017).

5.    Because HHS's policy violates the governing provisions of the Medicaid Act and regulations adopted in 2008, is otherwise arbitrary, capricious and unreasonable, and was adopted without observance of the procedure required by law, University Medical Center seeks an order declaring the policy invalid and granting injunctive relief enjoining its application against the hospitals. University Medical Center further requests that HHS be required to take all necessary and appropriate steps to ensure that the State Medicaid program does not limit the hospital's Medicaid DSH payments for the past, present or future, based upon the application of the agency's unlawful policy.

## JURISDICTION AND VENUE

6.    Jurisdiction is proper under 28 U.S.C. § 1331.

7.       Venue is proper in this judicial district under 28 U.S.C. § 1391(e).

## THE PARTIES

8.       University Medical Center is a county-run, non-profit hospital in Las Vegas, Nevada.   The hospital treats a disproportionate number of low-income patients and receives Medicaid DSH payments.

9.       Defendant Eric D. Hargan is the Acting Secretary of Health and Human Services. References in this Complaint to the Secretary or HHS are meant to refer to him, to his subordinates, and to his official predecessors, or successors as the context requires.

10.       The Secretary's agency, HHS, houses the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicaid program.   At some times relevant to this case, CMS was called the Health Care Financing Administration.   References in this Complaint to CMS are meant to refer to that component of HHS and its predecessors, as the context requires.

## STATUTORY AND REGULATORY BACKGROUND

### *Medicaid Act*

11.       The Medicaid Act, enacted in 1965, establishes a cooperative federal-state program that provides medical assistance to low-income individuals and families.   *See* 42 U.S.C. §§ 1396, *et seq.*; *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990).   A state Medicaid program must be operated under a binding Medicaid state plan that has been approved by CMS. *See* 42 U.S.C. §§ 1396, 1396a; *Wilder*, 496 U.S. at 502.

12.       Once a state plan is approved by CMS, the state Medicaid program must reimburse hospitals for covered services furnished to Medicaid patients at rates established and approved under the Medicaid state plan.   *See* 42 U.S.C. §§ 1396a, 1396b.

13.     The federal government provides federal matching funds, "federal financial participation," or "FFP," for expenditures under the approved Medicaid state plan in providing medical assistance, including payments to hospitals for covered services furnished to Medicaid patients.  *See* 42 U.S.C.§§ 1396a, 1396b.  The state is responsible for transmitting reimbursement funds to the providers of such services, including hospitals.  *See id* § 1396a(13)(A); *Wilder*, 496 U.S. at 502.

### *Medicaid DSH Payments*

14.     In 1981, Congress amended the Medicaid Act to ensure that reimbursements to hospitals "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients."   42 U.S.C. § 1396a(a)(13)(A)(iv).   DSH hospitals, therefore, are entitled under the Medicaid Act to receive "an appropriate increase in the rate or amount of payment for such services."  *La. Dep't of Health & Hosps. v. CMS*, 346 F.3d 571, 573 (5th Cir. 2003).  This payment is known as a Medicaid DSH payment.  The purpose of the DSH payment is "to stabilize [DSH] hospitals financially and preserve access to health care services for eligible low-income patients."  *Va. Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 3 (D.D.C. 2009).

15.     The Medicaid Act requires states to submit annually to the Secretary a report and an independent certified audit on DSH payments.  42 U.S.C. § 1396r-4(j).  The audit is to verify, *inter alia*, that "only the uncompensated care costs" described in section 1396r-4(g)(1)(A) are included in calculation of hospital-specific limits.  42 U.S.C. § 1396r-4(j)(2)(C).

### *Medicaid DSH Payment Cap*

16.     In 1993, Congress established a limit on the Medicaid DSH payment amount paid to a hospital for a given year.  Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66,

§ 13621, 107 Stat. 312, 629-32 (1993) (codified at 42 U.S.C. § 1396r-4(g)(1)(A)).  Under the

statute, the Medicaid DSH limit is equal to the costs of hospital services furnished to Medicaid-

eligible and uninsured patients, net of Medicaid payments for those services and payments made

by those uninsured patients.  *Id*.

17.    In particular, the Medicaid DSH limit, or cap, is calculated based on the following

calculation of specific, statutorily defined uncompensated care costs:

> the costs incurred during the year of furnishing hospital services
> (as determined by the Secretary and net of payments under [the
> Medicaid Act], other than under this section [i.e., the Medicaid
> DSH payment], and by uninsured patients) by the hospital to
> individuals who either are eligible for medical assistance under the
> [Medicaid] State plan or have no health insurance (or other source
> of third party coverage) for services provided during the year.

*Id*. § 1396r-4(g)(1)(A).  The subchapter referenced in 42 U.S.C. § 1396r-4(g)(1)(A) is the

Medicaid statute in title XIX of the Social Security Act, codified as Subchapter XIX of Title 42,

of the United States Code.

18.    The specific measure of uncompensated care cost prescribed by Congress in

section 1396r-4(g)(1)(A) compares particular costs and payments attributable to two patient

categories.  These comparisons yield two corresponding payment "shortfalls."  The first shortfall,

often referred to as the "Medicaid shortfall," is statutorily defined as cost incurred by a hospital

for services furnished to Medicaid patients, less Medicaid payments other than DSH payments.

42 U.S.C. § 1396r-4(g)(1)(A).  Payments from any source other than Medicaid are not among the

statutorily enumerated payments that are to be counted in the calculation of the Medicaid

shortfall. *See id*.

19.    The second shortfall used to calculate a hospital's uncompensated care cost, as

defined in section 1396r-4(g)(1)(A), is an uninsured patient shortfall.  It includes the cost

incurred by a hospital for hospital services furnished to uninsured patients, less only the payments made to the hospital by those uninsured patients. *Id*.

### *Secretary's Original, Contemporaneous Interpretation of the Medicaid DSH Cap*

20.     Shortly after Congress enacted section 1396r-4(g)(1)(A), the Secretary's agency issued directions to State Medicaid Directors regarding the costs and payments included in the calculation of the DSH cap.  That directive came in the form of a letter to State Medicaid Directors dated August 17, 1994, (*available at* https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/smd081794.pdf, last accessed Nov. 30, 2017).  Consistent with section 1396r-4(g)(1)(A), the 1994 State Medicaid Directors letter did not say that payments made to a hospital by Medicare or any third party other than Medicaid should be offset against the costs incurred by a hospital in furnishing services to Medicaid patients.  The 1994 State Medicaid Directors letter interpreted section 1396r-4(g)(1)(A) as follows:

> CALCULATION OF LIMIT
>
> The limit applicable to DSH payment adjustments is composed of two parts. The first part of the limit is the Medicaid "shortfall". The "shortfall" is the cost of services furnished to Medicaid patients, less the amount paid under the non-DSH payment method under the State plan.
>
> The second part of the formula is the cost of services provided to patients who have no health insurance or source of third party payment for services provided during the year, less the amount of payments made by these patients.

21.     The 1994 State Medicaid Directors letter also included a detailed set of instructions on the costs that may be included in the calculation of the Medicaid DSH cap.  The instructions allowed a State to use "the definition of allowable costs in its [Medicaid] State plan, *or any other definition*, as long as the costs determined under such a definition do not exceed the amounts that would be allowable under the Medicare principles of cost reimbursement."

6

(Emphasis added.)  The Medicare principles of cost reimbursement referenced in the 1994 State

Medicaid Directors letter include all costs actually incurred in the efficient delivery of necessary

health services, and those costs are not reduced by payments made by, or on behalf of, a patient

by Medicare or any other third-party payer.  *See, e.g.*, 42 U.S.C. § 1395x(v)(1)(A) (Medicare Act

definition of reasonable cost); 42 C.F.R. Part 413 (Medicare principles of reasonable cost

reimbursement); *id*. § 413.9 (providing Medicare program reimbursement for actual costs

incurred in the efficient delivery of necessary services).

22.     The 1994 letter addressed to State Medicaid Directors explained the costs that are

included in calculation of the hospital-specific limit as follows:

DSH LIMIT = M + U

M = Cost of Services to Medicaid patient, less the amount paid by
the State under the non-DSH payment provisions of the State plan.

U = Cost of Services to Uninsured Patients, less any cash
payments made by them.

### *2008 DSH Payment Regulations*

23.     In 2008, CMS issued a final rule implementing Medicaid DSH payment reporting

and auditing requirements under legislation enacted in 2003.  CMS, *Medicaid Program;*

*Disproportionate Share Hospital Payments*, 73 Fed. Reg. 77,904, 77,950 (Dec. 19, 2008).  The

2008 rule requires each state Medicaid program to submit to CMS certain information "for each

DSH hospital to which the State made a DSH payment in order to permit verification of the

appropriateness of such payments."  *Id.*; 42 C.F.R. § 447.299(c).

24.     In the preamble to the 2008 rule, the Secretary stressed that the rule did not

establish or change any substantive rules concerning the calculation of the Medicaid DSH cap.

73 Fed. Reg. at 77,906 ("This regulation does not alter any of the substantive standards regarding

the calculation of hospital costs"); *accord id.* at 77,921 (stating in response to comments "we

disagree that this rule changes the definition of uncompensated care that is counted in calculating the hospital-specific DSH limit"). Accordingly, the rule did not acknowledge a policy change or attempt to explain reasons for a change from the agency's prior directions to State Medicaid programs under its established interpretation of section 1396r-4(g)(1)(A).

25.     The 2008 rule adopted regulations defining the calculation of the Medicaid DSH cap that are consistent with the Secretary's original interpretation of section 1396r-4(g)(1)(A) in the 1994 State Medicaid Directors letter. *See* 73 Fed. Reg. at 77,950; 42 C.F.R. § 447.299(c) (2009).

26.     Concerning the Medicaid shortfall portion of the calculation of the DSH cap, the 2008 regulation defined a hospital's "Total Medicaid Uncompensated Care" at 42 C.F.R. § 447.299(c)(11) (2009). 73 Fed. Reg. at 77,950. Section 447.299(c)(11) provides that a hospital's "Total Medicaid Uncompensated Care" amount is "the result of subtracting the amount identified in § 447.299(c)(9) from the amount identified in § 447.299(c)(10)." 73 Fed. Reg. at 77,950; 42 C.F.R. § 447.299(c)(11) (2009).

27.     Section 447.299(c)(9) of the regulation is titled "Total Medicaid IP/OP Payments." The payment amount identified in that regulation is the sum of three Medicaid payment amounts described in sections 447.299(c)(6)-(8) of the regulation. None of those Medicaid payments involves any payment made to a hospital by Medicare or any other third-party payer other than Medicaid. 73 Fed. Reg. at 77,950.

28.     Section 447.299(c)(10) of the regulation is entitled "Total Cost of Care for Medicaid IP/OP Services." The regulation provides that a hospital's cost of Medicaid patient services is: "The total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals." *Id*. The regulation does not

reference payments made to a hospital by Medicare or private insurance.  73 Fed. Reg. at 77,950 (text of regulation for publication in C.F.R.).

29.    The 2008 regulations governing the calculation of the Medicaid DSH cap did not define cost component the Medicaid shortfall as a net amount of cost incurred after deduction of any payments made to a hospital for services furnished to Medicaid patients.  73 Fed. Reg. at 77,950.  The 2008 regulations defined total cost to mean the "total annual cost incurred" by a hospital and then subtracted three specified Medicaid program payments from that amount to determine the hospital's "Total Medicaid Uncompensated Care."  *Id.*; 42 C.F.R. § 447.299(c)(6)-(11) (2009).  The 2008 regulations nowhere provided for Medicare payments or payments from any other third-party payer to be subtracted from a hospital's cost to calculate a hospital's "Total Medicaid Uncompensated Care."  *Id.*

### *2010 Answers to "Frequently Asked Questions"*

30.    In 2010, CMS published on its website "Additional Information on the DSH Reporting and Auditing Requirements" in the form of answers to ostensibly frequently asked questions ("FAQs") (*available at* https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf, last accessed Nov. 30, 2017).  CMS asserted in FAQs 33 and 34 that hospitals should offset private health insurance payments and Medicare payments for services furnished to Medicaid patients against the actual hospital costs incurred in furnishing services to those Medicaid patients in calculating the Medicaid shortfall for purposes of the Medicaid DSH cap under section 1396r-4(g)(1)(A):

> 33. [Q]  Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of the MIUR [Medicaid inpatient utilization rate] percentage and the DSH limit

in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?

[A]  Days, cost, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid inpatient utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

34. [Q]  The regulation states that costs for dual eligibles should be included in uncompensated care costs. Could you please explain further?  Under what circumstances should we include Medicare payments?

[A]  Section 1923(g) of the Act defines hospital-specific limits on FFP for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of individuals dually eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligibles when calculating the uncompensated costs of serving Medicaid eligible individuals. Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligibles. In calculating the Medicare payment for service, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligibles.

31.    Because the policy adopted in the 2010 FAQs quoted above is inconsistent with

the plain language of the Medicaid Act, 42 U.S.C. § 1396r-4(g)(1)(A), and the 2008 regulations

governing the calculation of the Medicaid DSH cap under the statute, and the FAQs were

10

adopted without notice-and-comment rulemaking, several federal courts have preliminarily or permanently enjoined CMS from enforcing the policy adopted in the 2010 FAQs.  *See Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) (preliminary injunction against enforcement of FAQ 33); *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2016 WL 1048023 (D.N.H. Mar. 11, 2016) (preliminary injunction against enforcement of FAQs 33 and 34); *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2017 WL 822094 (D.N.H. Mar. 2, 2017) (permanent injunction against enforcement of FAQs 33 and 34); *Children's Hospital of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672 (E.D. Va. 2017) (preliminary injunction against enforcement of FAQ 33); *Tennessee Hosp. Ass'n v. Price*, No. 16-cv-3263, 2017 WL 2703540 (M.D. Tenn. June 21, 2017) (permanent injunction against enforcement of FAQs 33 and 34); *Children's Health Care v. Price*, No. 16-cv-4064, (D. Minn. June 26, 2017) (permanent injunction against enforcement of FAQ 33).

### *2017 Final Rule*

32.    On August 15, 2016, the Secretary issued a notice of proposed rulemaking to amend the 2008 Medicaid DSH regulations to incorporate the policy set forth in the 2010 FAQs 33 and 34.  CMS, *Medicaid Program; Disproportionate Share Hospital Payments—Treatment of Third Party Payers in Calculating Uncompensated Care Costs, Proposed Rule*, 81 Fed. Reg. 53,980 (Aug. 15, 2016).  The Secretary proposed to require that "[a]ll third party payments (including, but not limited to, payments by Medicare and private insurance) must be included in the calculation of uncompensated care costs for purposes of determining the hospital specific DSH limit."  *Id.* at 53,983.

33.    Comments on the proposed rule urged CMS not to adopt it because it would be inconsistent with the Medicaid statute, the 2008 regulations, the Secretary's prior contemporaneous interpretation of the statute, and it would cause DSH hospitals significant

financial harm.  A hospital in Kentucky explained, for example, that the proposed rule "could harmfully reduce or even eliminate DSH funding for [the] hospitals that the program was created for to help [*sic*] in the beginning" and "could lead to the closing of several hospital's doors in the areas that need them the most."  *See* Exhibit A.  A Texas hospital also emphasized that the rule "would substantially reduce [its hospital specific DSH limit] and would significantly impact [its] long-term financial ability [] to adequately serve [] vulnerable patient populations."  *See* Exhibit B.

34.     On April 3, 2017, the Secretary published a final rule and amended the 2008 Medicaid DSH regulations to incorporate the policy set forth in the 2010 FAQs 33 and 34.  CMS, *Medicaid Program; Disproportionate Share Hospital Payments—Treatment of Third Party Payers in Calculating Uncompensated Care Costs, Final Rule*, 82 Fed. Reg. 16,114 (Apr. 3, 2017).  The 2017 final rule amended the regulation codified as 42 C.F.R. § 447.299(c)(10) to redefine "Total Cost of Care for Medicaid IP/OP Services" as follows:

> The total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals. The total annual costs are determined on a hospital-specific basis, not a service-specific basis. For purposes of this section, costs—
>
> (i) Are defined as costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance.
>
> (ii) Must capture the total burden on the hospital of treating Medicaid eligible patients prior to payment by Medicaid. Thus, costs must be determined in the aggregate and not by estimating the cost of individual patients.  For example, if a hospital treats two Medicaid eligible patients at a cost of $2,000 and receives a $500 payment from a third party for each individual, the total cost to the hospital for purposes of this section is $1,000, regardless of whether the third party payment received for one patient exceeds the cost of providing the service to that individual.

82 Fed. Reg. at 16,122.

35.     The effective date of the final rule is June 2, 2017.  *Id*. at 16,115.  The Secretary

has conceded that the final rule will not have retroactive effect.  *See Tennessee Hosp. Ass'n*,

No. 16-cv-3263, 2017 WL 2703540, at *8; *Children's Hospital of the King's Daughters, Inc.*, 258

F. Supp. 3d 672 n.2.

36.     The preamble to the 2017 final rule claims it is a mere "clarification of the

existing policy."  82 Fed. Reg. at 16,118.  The 2017 final rule does not acknowledge or explain

any reasons for the change from the 2008 regulations or the Secretary's prior contemporaneous

interpretation of section 1396r-4(q)(1)(A) at the time of its enactment, including in the 1994

State Medicaid Directors letter.

## FACTUAL BACKGROUND

37.     University Medical Center is a public, non-profit Medicaid DSH hospital.

Accordingly, the amount of its Medicaid DSH payment is subject to audit, and the policy

reflected in the FAQs and the 2017 Final Rule affects the calculation of its DSH cap reviewed at

audit.

38.     The offset of all Medicare and third party insurer payments (rather than only

payments by Medicaid and uninsured patients), against the costs of hospital services furnished to

Medicaid-eligible and uninsured patients, would substantially reduce University Medical

Center's Medicaid DSH cap and wrongfully deprive the hospital of Medicaid funding it needs to

provide care for low-income patients.

## ASSIGNMENT OF ERRORS

39.     The Administrative Procedure Act ("APA") requires a reviewing court to "set

aside and hold unlawful" agency action that is "(A) arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2).

## COUNT I - VIOLATION OF THE MEDICAID ACT

40.     The Secretary's new policy in the 2010 FAQs 33 and 34 and in the 2017 final rule violates the plain meaning and intent of the controlling provision of the Medicaid Act, 42 U.S.C. § 1396r-4(g)(1)(A).

41.     Section 1396r-4(g)(1)(A) of the Medicaid Act defines the particular costs and payments that are considered in the calculation of the Medicaid DSH cap and the Medicaid shortfall used to establish the cap.  The statute specifies that certain Medicaid program payments are to be netted against a hospital's costs of services furnished to Medicaid patients.  42 U.S.C. § 1396r-4(g)(1)(A).  The statute does not offset payments from private insurers or Medicare against the cost of services furnished to Medicaid patients.  *Id.*

42.     In specifying that only certain Medicaid "payments" are to be netted against "costs" of uncompensated care, Congress plainly expressed its intent that "costs" and "payments" are separate items.  The Secretary's interpretation of "costs" renders the separate statutory treatment of "payments" redundant and conflates that term with the dictionary definitions for entirely different terms like "profit," "loss" and "net income."  *Contrast, e.g.*, Black's Law Dictionary (10th ed. 2014) (defining profit as "[t]he excess of revenues over expenditures in a business transaction.") *with Random House Webster's Unabridged Dictionary* (2d ed. 2001) (defining cost as "an outlay or expenditure of money, time, labor, trouble, etc.") (Definition No. 2).

43.     The Secretary's new policy circumvents the Medicaid Act's specification of the particular payments that are subtracted from hospital costs of services furnished to Medicaid-

eligible and uninsured patients in calculating the Medicaid DSH cap by improperly deducting Medicare and other third-party payments.

44.     The relevant legislative history of section 1396r-4(g)(1)(A) of the Medicaid Act does not support the policy in the 2010 FAQs and 2017 final rule.  Rather, it reinforces the plain meaning of the statute by explaining that Congress intended to "limit[] the amount of payment adjustments to State or locally-owned or operated DSH hospitals to the costs (as determine [*sic*] by the Secretary) these facilities incur in furnishing inpatient or outpatient services to Medicaid-eligible patients and uninsured patients, net of any payments received by the facility under Medicaid (other than the DHS [*sic*] payment adjustment) and any out-of-pocket payments received from uninsured individuals."  H.R. Rep. No. 103-111 at 212 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 539; *see also Medicare Prescription Drug, Improvement, and Modernization Act of 2003 Conference Report*, H.R. Rep. No. 108-391, 808 (2003) (Conf. Rep.), *reprinted in* 2003 U.S.C.C.A.N. 1808, 2160 ("DSH payments to each inpatient general hospital are limited to some percentage of the costs of providing inpatient and outpatient services to Medicaid and uninsured patients at that hospital, less payments received from or on behalf of Medicaid and uninsured patients.  These costs are considered to be unreimbursed costs.").

45.     The Secretary's new policy conflicts with the nature and purpose of section 1396r-4(g)(1)(A).  That statutory provision employs a particular measure of a hospital's total uncompensated care costs, not the total uncompensated cost of all services furnished to all hospital patients.  The statute considers only particular, specified costs and payments for services furnished to two categories of patients.  By offsetting additional payments for services furnished to Medicaid-eligible patients, the Secretary's new policy distorts the statute's particularized measure of certain uncompensated care cost, which measure does not consider the costs of

services furnished to Medicare patients or other insured patients, the payments for those services, or the shortfalls in payments for those services.

46.     The Secretary failed his obligation to acknowledge the change of law and policy that the 2010 FAQs and the 2017 final rule represent, to show that good reasons support the new rule, and to account for the serious reliance interests of affected hospitals that the prior longstanding rule and policy engendered.  The policy adopted in the 2010 FAQs and the 2017 final rule, therefore, is arbitrary, capricious, and not entitled to deference.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. ___, ___, 136 S. Ct. 2117, 2126 (2016) ("When an agency changes its existing position . . . [it] must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'  In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'") (quoting *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009), and citing *Smiley v. Citibank (South Dakota), N. A*., 517 U.S. 735, 742 (1996)).

47.     The Secretary's explanation for the 2017 final rule runs counter to the relevant evidence presented by stakeholders during the rulemaking, and the Secretary failed to articulate a satisfactory explanation that makes a rational connection between the relevant facts and the choice made in the final rule.

48.     The Secretary's adoption of the 2017 final rule was not the product of reasoned decision making.  The agency did not engage in consideration of the important factors that must be assessed in appropriate regulatory analysis, *see, e.g*., Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq.*, based on its erroneous and unreasonable characterization of the final rule as a clarification rather than a substantive change of law.  The policy adopted in the final rule is a

16

substantive change from the 2008 regulations and the agency's prior established interpretation of the Medicaid statute, and, as explained to the Secretary in comments on the proposed rule, will have a significant economic impact on a substantial number of the nation's safety-net hospitals that treat a disproportionate number of low-income patients.

## COUNT II - VIOLATION OF THE 2008 REGULATIONS

49.     The Secretary's policy in the 2010 FAQs 33 and 34 is inconsistent with the plain language and intent of the 2008 regulations governing the calculation of the Medicaid DSH cap, 73 Fed. Reg. at 77,950, 42 C.F.R. § 447.299(c)(6)-(11) (2009).  The Secretary's policy, therefore, is invalid as applied to periods before the June 2017 effective date of the 2017 final rule.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (holding courts owe no deference to a Secretary's position when an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.") (internal citations omitted).

50.     The 2008 regulations defined the "Total Cost of Care for Medicaid IP/OP services" to include "total annual costs incurred" for the services without offset by payments for those services from any source.  73 Fed. Reg. at 77,950; 42 C.F.R. § 447.299(c)(10).  The 2008 regulations further provided that just three Medicaid program payments are offset against the total annual costs incurred for Medicaid patient services to calculate a hospital's "Total Medicaid Uncompensated Care."  73 Fed. Reg. at 77,950; 42 C.F.R. § 447.299(c)(6)-(9), (11).

51.     The preamble to the 2008 final rule stressed that it was not intended to make any substantive changes to the calculation of the Medicaid DSH limit.  73 Fed. Reg. at 77,906; *see also id.* at 77,921.  The agency's prior established interpretation of section 1396r-4(g)(1)(A) of the Medicaid Act, including in the 1994 State Medicaid Directors letter, did not define the costs

of Medicaid patient services as the net difference between the costs incurred and revenues received for those services.

52.     The 2008 Rule is unambiguous, but even if it left any ambiguity the FAQs are not a reasonable construction of the Rule for the same reasons that they are not a reasonable construction of the Medicaid Act.   Furthermore, they conflict with the Secretary's prior and longstanding interpretation of the Medicaid Act.   The FAQs therefore would not be entitled to deference in any event.   *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012) (deference to an agency's interpretation of its own regulation is inappropriate when it conflicts with a prior interpretation) (citing *Thomas Jefferson Univ.*, 512 U.S. at 515); *Thomas Jefferson Univ.*, 512 U.S. at 512 (courts owe no deference to the Secretary's position when an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation") (internal citations omitted).

## COUNT III - VIOLATION OF THE APA'S NOTICE-AND-COMMENT RULEMAKING REQUIREMENTS

53.     The policy adopted in the 2010 FAQs was promulgated without observance of the notice-and-comment rulemaking procedure required by the APA, 5 U.S.C. § 553.   The policy amounts to a legislative rule that substantively altered existing law under the 2008 regulations. The Secretary, therefore, was required to undertake notice-and-comment rulemaking in adopting that policy change.   The Secretary's failure to do so violates the APA's rulemaking requirement and therefore must be set aside.

54.     The 2017 final rule violates the rulemaking procedure required by the APA, and is also arbitrary and capricious, because the Secretary failed to give adequate consideration to stakeholders' comments.   Hospitals explained that the rule would have a substantial, and in some cases devastating, financial impact on hospitals that care for large numbers of low-income

persons. The Secretary failed to meaningfully consider and account for these important concerns, and he failed to consider important aspects of the problem of DSH hospital losses.

**RELIEF REQUESTED**

For the foregoing reasons, plaintiff hospitals request an Order:

a)       declaring invalid and vacating FAQs 33 and 34 and the 2017 Final Rule;

b)       enjoining the Secretary from enforcing, applying, or implementing FAQs 33 and 34;

c)       directing the Secretary to take all appropriate and necessary action to ensure that the State of Nevada does not enforce, apply, or implement the policy reflected in FAQs 33 and 34 or take other action to recoup any DSH funds provided to Nevada based on FAQs 33 and 34;

d)       enjoining the Secretary from enforcing, applying, or implementing the 2017 Final Rule;

e)       directing the Secretary to take all appropriate and necessary action to ensure that the State of Nevada does not enforce, apply, or implement the 2017 Final Rule;

f)       directing the Secretary to pay Plaintiff's legal fees and other costs of suit; and

g)       providing such other relief as the Court may deem appropriate.


Respectfully submitted,


/s/ Christopher L. Keough
Christopher L. Keough
 D.C. Bar No. 436567
Stephanie A. Webster
 D.C. Bar No. 479524
Caroline L. Wolverton
 D.C. Bar No. 496433
Alex J. Talley
 D.C. Bar No. 1020488

AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 887-4038
Fax: (202) 887-4288
ckeough@akingump.com

Dated: November 30, 2017